# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 15, 2020

Lyle W. Cayce
Clerk

No. 18-11572

TRENT TAYLOR,

          *Plaintiff—Appellant*,

*versus*

MICHAEL MCDONALD, *Psychiatrist/P.A.,
Individually and in their official capacity*;
SHAWN VALLANCE,
*Sergeant of Corrections Officer, Individually and in their official capacity*;
OPAL MANKINS, *R.N., Individually and in their official capacity*;
JANIS WOODALL, *L.C.S.W., Individually and in their official capacity*;
KIM DAVIS, *L.V.N., Individually and in their official capacity*;
SEAN O'DONNEL, *P.H.D., Individually and in their official capacity*;
MS. MARILYN NOBLE, *P.A., Individually and in their official capacity*;
PRIYA KANDHERIA, *M.D., Individually and in their official capacity*,

          *Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:14-CV-149

Before SMITH, CLEMENT, and OLDHAM, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

    Trent Taylor, a federal prisoner, initially consented to be transferred to the psychiatric unit at the John T. Montford Unit, a Texas Department of

No. 18-11572

Criminal Justice ("TDCJ") medical facility. But he was not transferred back to his normal housing for two months after withdrawing consent, with no intervening involuntary commitment proceedings. For part of that time, he was monitored in a Suicide Prevention Program.

Taylor sued under 42 U.S.C. § 1983, alleging that defendants' failure to transfer him back without commitment proceedings violated his due process rights under *Vitek v. Jones*, 445 U.S. 480 (1980). The district court granted summary judgment for the defendants on the ground of qualified immunity ("QI"). We affirm.

During Taylor's imprisonment at the Robertson Unit of TDCJ, he overdosed on an unknown number of pills. He was hospitalized, and upon his return to Robertson the doctors deemed the overdose a possible suicide attempt. Taylor consented to be admitted to Montford, which provides in-patient psychiatric care. TDCJ policy says that when inmates give such consent, they must be informed that they can withdraw it at any time. Taylor also consented to receive treatment at Montford; the treatment consent form specified that he may discontinue treatment at any time.

Taylor was admitted to the crisis management section of Montford. The conditions of his initial cell are subject to a dispute not relevant here,[1] but what is not disputed is that upon being shown his cell, Taylor said he would harm himself if he were housed there. Based on his stated suicidal ideation, Taylor was placed in a seclusion cell, which is a special cell lacking anything inmates could use for self-harm (including a wash basin and a bed), in which inmates are closely observed.

Once in the seclusion cell, Taylor said he was not suicidal and had only

---

[1] *See Taylor v. Stevens*, 946 F.3d 211 (5th Cir. 2019), *petition for cert. filed* (Apr. 24, 2020) (No. 19-1261).

No. 18-11572

claimed to be so in order to avoid being housed in the initial cell. A few days later, he was moved back to his initial cell, but upon arriving there he again said he was suicidal, and so was taken back to the seclusion cell. While there, he repeated his claim that he only said that to avoid being housed in that cell; he requested to be discharged, declining any further treatment.

Despite that request, Taylor was not transferred back to Robertson. Instead, because of his intermittent claims of suicidal ideation, the "Warden's Committee"[2] placed Taylor in the A1-3 Row Suicide Prevention Program. The A1-3 Row is a housing unit set up for specialized monitoring intended to reduce the likelihood of self-harm. The characterization of the A1-3 Row Program is somewhat disputed. Taylor describes it as a behavioral-change program, though the defendants aver it is a purely observational security measure.

Labels aside, the contents of the program are not genuinely disputed. Upon arrival in the A1-3 Row, inmates are oriented to the goals of the housing's Suicide Prevention Program. The program does not involve forced medication of any kind. Unlike the seclusion cells, the A1-3 Row cells have wash basins and beds, but inmates are subject to deprivations designed to mitigate the chances of self-harm. Inmates in the A1-3 Row are provided with meals in sacks in lieu of trays, are given a suicide blanket instead of normal bedding, and wear hospital gowns, not normal clothing. They are not permitted to have anything with which they could conceivably hurt themselves, including papers. They are visually observed every fifteen minutes.

While on the A1-3 Row, Taylor was psychiatrically evaluated by a number of the defendants. In Dr. Khandheria's evaluation, she recom-

---

[2] The "Warden's Committee" is a group of clinicians and security staff that addressed management concerns, including inmate housing.

No. 18-11572

mended Taylor be transferred out of the A1-3 Row because she no longer believed he was suicidal. One week later, McDonald, a psychiatric physician assistant, recommended the same, and a few days after that Taylor was transferred out of the A1-3 Row.

After that transfer, Taylor was kept in normal cells at Montford under close observation. During that time, he declined further treatment and indicated he wanted to be discharged for a second and third time. But an additional three weeks passed between Taylor's second withdrawal of consent and his eventual discharge.

Taylor sued the defendants, the members of the "Warden's Committee," under § 1983. He alleges that once he withdrew consent, placing him in the A1-3 Row program without involuntary commitment procedures violated his due process rights articulated in *Vitek v. Jones*. There, the Court held that "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." *Jones*, 445 U.S. at 494. Taylor similarly alleges that delaying his discharge by weeks after he reiterated his withdrawal of consent violated those same rights.

The defendants moved for summary judgment on the ground of QI. The district court granted the motion and dismissed with prejudice.

QI "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Bustillos v. El Paso Cty. Hosp. Dist.*, 891 F.3d 214, 220 (5th Cir. 2018) (internal quotation marks omitted). "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official

Case: 18-11572   Document: 00515629611   Page: 5   Date Filed: 11/06/2020
Case 5:14-cv-00149-C   Document 280   Filed 11/06/20   Page 5 of 8   PageID 4777

No. 18-11572

would understand that what he is doing violates that right.'" *Id.* (quoting *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014)). The contours are sufficiently clear if "[t]he unlawfulness of the defendant's actions [was] readily apparent from sufficiently similar situations, but it is not necessary that the defendant's exact act have been [declared] illegal." *Brown*, 623 F.3d at 253. With that in mind, we turn to whether the defendants violated Taylor's clearly established rights under the Due Process Clause.

### I.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkerson v. Goodwin*, 774 F.3d 845, 851 (5th Cir. 2014) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). In *Jones*, 445 U.S. at 491–93, the Court held that being involuntarily committed to a mental hospital implicates a prisoner's liberty interest. Reasoning that "commitment to a mental hospital can engender adverse social consequences [i.e. stigma] to the individual," the Court held that "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement." *Id.* at 492 (internal quotation marks omitted). In reaching that conclusion, the Court relied on the fact that Jones's commitment included "[c]ompelled treatment in the form of mandatory behavior modification programs." *Id.* "[D]etermin[ing] that he has a mental illness" and "subject[ing] him involuntarily to institutional care in a mental hospital . . . are qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.* at 493. Therefore, "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires

No. 18-11572

procedural protections." *Id.* at 494.

The Fifth Circuit clarified the scope of the *Jones* liberty interest in *Toney v. Owens*, 779 F.3d 330, 340 (5th Cir. 2015), where we held that "stigma alone is insufficient to trigger a liberty interest under the Due Process Clause" (capitalization altered). Instead, "procedural due process claimants must establish stigma—*in addition to qualitatively different conditions*—to claim an unconstitutional infringement of a liberty interest." *Id.* (emphasis added). Therefore, the only clearly established liberty interest is in the *combination* of the potential stigma of commitment to a mental institution and its potentially qualitatively different conditions.

That means that housing an inmate in a psychiatric unit, without more, does not *necessarily* trigger a liberty interest clearly established by *Jones* or its progeny. If the conditions of confinement at the psychiatric unit were, hypothetically, not qualitatively different from the conditions at a typical prison, then there would be no liberty interest in avoiding being housed there.[3]

To be sure, in the typical case, the conditions of confinement at a psychiatric unit will be qualitatively different from those of prison, most often in the form of psychiatric treatment. That is why prisoners undoubtedly have a liberty interest in not being transferred to a psychiatric unit in the first instance.[4]

---

[3] *See Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008) (per curiam) (holding that a custodial classification does not trigger a liberty interest unless it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" (internal quotation marks omitted)).

[4] *See Meza v. Livingston*, 607 F.3d 392, 408 (5th Cir. 2010) ("[T]he full panoply of due process [is] required before involuntarily transferring a prisoner to a mental institution.").

No. 18-11572

With that said, the situation conceivably could be different where, as here, the inmate consents to the initial transfer and then later withdraws consent. Once he is already being housed there, if the inmate is not receiving any psychological treatment, it is not certain that the conditions of his confinement are *necessarily* qualitatively different such that he has a liberty interest in not remaining there. And no relevant precedent holds that upon withdrawing consent, inmates must either be transferred out or involuntarily committed with procedural protections.

We need not—and do not—decide that issue today. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). It is enough that it is not clearly established that an inmate has a liberty interest in being transferred out of a psychiatric unit to which he initially consented to be admitted and where he is not receiving treatment.

Therefore, the defendants did not violate Taylor's clearly established rights by keeping him in a normal cell in the Montford Unit after moving him from the A1-3 Row. Though Taylor withdrew his consent a full month before ultimately being transferred back to Robertson (not to mention his initially withdrawing consent a month before that), the only notable condition of his confinement after being transferred out of the A1-3 Row was that he was kept under close observation. It is not clearly established that observation of that sort is a qualitatively different condition that triggers a liberty interest.

What remains is to determine whether defendants violated Taylor's clearly established rights by placing him on the A1-3 Row Suicide Prevention Program even though he'd already withdrawn consent and declined further treatment. The caselaw is unclear as to what precisely constitutes qualitatively different conditions. At one end of the spectrum, being forced to take psychotropic drugs or to undergo behavior modification therapy is qualitatively different. *See Washington v. Harper*, 494 U.S. 210, 221–22 (1990);

7

No. 18-11572

*Jones*, 445 U.S. at 494. At the other end of the spectrum, merely being psychologically evaluated is not qualitatively different.[5]

The A1-3 Program falls somewhere in the middle of that spectrum. On the one hand, it does not involve any medication or cognitive therapy. Other than having inmates closely observed and deprived of objects that could be used for immediate self-harm, the program does not attempt to modify behavior. On the other hand, the special restrictions put in place to prevent self-harm might be qualitatively different enough to require procedural protections.

As above, we need not, and do not, decide whether the A1-3 Suicide Prevention Program, or others like it, are qualitatively different enough to trigger a liberty interest. It is enough to note that "clearly established law should not be defined at a high level of generality," but instead, "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted). Even viewing the program in the light most favorable to Taylor, as we must on motion for summary judgment, the A1-3 program is not factually similar enough to any behavioral change program we've held triggers a liberty interest to constitute clearly established law. And as demonstrated in the above paragraph, whether the program is qualitatively different is not "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Therefore, the defendants are entitled to QI.

AFFIRMED.

---

[5] *Cf. United States v. McKown*, 930 F.3d 721, 732 (5th Cir. 2019) (differentiating an evaluative purpose of confinement from a restorative one), *cert. denied*, 140 S. Ct. 2518 (2020).